Helen Davis Chaitman (4266)
Phillips Nizer LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
*Attorneys for Appellants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DIANE and ROGER PESKIN, and
MAUREEN EBEL,

                          Appellants,

                  v.

IRVING H. PICARD, as Trustee for the
Liquidation of Bernard L. Madoff Investment
Securities LLC,

                          Defendant.

No. 09 Civ. 8730 (JGK)

**PLAINTIFFS/APPELLANTS' MEMORANDUM OF LAW ON APPEAL FROM
BANKRUPTCY COURT'S DISMISSAL OF COMPLAINT**

## TABLE OF CONTENTS

Page

Preliminary Statement.................................................................................................2

    Background of This Case.....................................................................................2

    The Complaint ....................................................................................................5

    The Error of the Bankruptcy Court in Dismissing the Complaint.......................6

STATEMENT OF THE BASIS FOR APPELLATE JURISDICTION .........................7

STATEMENT OF THE ISSUES PRESENTED AND APPLICABLE
STANDARD OF APPELLATE REVIEW.....................................................................7

    Issues on Appeal ................................................................................................7

    Standard of Review............................................................................................8

STATEMENT OF THE CASE.......................................................................................8

    Nature of the Case, Course of the Proceeding and Disposition By Court
    Below..................................................................................................................8

STATEMENT OF FACTS ...........................................................................................10

    The Peskins' Investment in Madoff.................................................................10

    Maureen Ebel's Investment in Madoff ...........................................................12

ARGUMENT................................................................................................................14

I.      THE BANKRUPTCY COURT ERRED IN DISMISSING PLAINTIFFS'
       CLAIM FOR A DECLARATORY JUDGMENT THAT THE TRUSTEE
       HAD NO RIGHT TO ASSERT PREFERENCE CLAIMS AGAINST
       THEM ...............................................................................................................14

II.    THE BANKRUPTCY COURT ERRED IN DISMISSING PLAINTIFFS'
       CLAIM FOR A DECLARATORY JUDGMENT THAT THE TRUSTEE
       VIOLATED HIS STATUTORY MANDATE TO PROMPTLY PAY
       CUSTOMER CLAIMS......................................................................................17

III.   THE BANKRUPTCY COURT ERRED BY DISMISSING PLAINTIFFS'
       BREACH OF FIDUCIARY DUTY CLAIM .....................................................21

    A.      The Trustee Owes a Fiduciary Duty to Customers................................21

B.  The Trustee Breached His Fiduciary Duty to the Plaintiffs....................................22

C.  The Trustee's Counsel Misrepresented the Law to Plaintiffs................................23

D.  Plaintiffs Have Alleged That They Suffered Damages and
    Their Claims are Ripe ...........................................................................................25

IV.  THE BANKRUPTCY COURT ERRED IN HOLDING THAT THE
     COMPLAINT VIOLATED THE CLAIMS PROCEDURE ORDER..............................25

V.  THE BANKRUPTCY COURT ERRED IN DISMISSING EBEL'S
    CLAIM FOR A DECLARATORY JUDGMENT THAT THE TRUSTEE
    HAD EXTRACTED FROM HER, UNDER DURESS, AN
    ACKNOWLEDGMENT THAT HER CLAIM FOR HER IRA
    ACCOUNT WAS LIMITED TO HER NET INVESTMENT .........................................28

CONCLUSION...............................................................................................................31

1097642.1

# TABLE OF AUTHORITIES

## CASES

In re Adler, Coleman Clearing Corp., 1998 Bankr. LEXIS 1076 (B. S.D.N.Y. Aug. 25, 1998) .................................................................................................................................21, 22

Appleton v. First National Bank of Ohio, 62 F.3d 791 (6th Cir. 1995).........................................29

In re AroChem Corp., 176 F.3d 610 (2d Cir. 1999) ........................................................................9

Bank of American National Trust and Savings Associate v. Private Trust Corp., 1998 U.S. Dist. LEXIS 6353 (S.D.N.Y. May 6, 1998).........................................................................16

Bastys v. Rothschild, 2000 U.S. Dist. LEXIS 17944 (S.D.N.Y. Nov. 20, 2000).........................25

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)...................................................................21

Bell & Beckwith v. McGraw, 937 F.2d 1104 (6th Cir. 1991) ......................................................18

In re Bevill, Bresler & Schulman, Inc., No. 85-1728 (D.N.J. May 22, 1989)..............................26

Brooks v. Flagg Brothers, Inc., 63 F.R.D. 409 (S.D.N.Y. 1974)..................................................16

In re Donald Sheldon & Co., Inc., 153 B.R. 661 (B. S.D.N.Y. 1993)...........................................19

In re Dorholt, Inc., 224 F.3d 871 (8th Cir. 2000) .........................................................................24

Drees v. County of Suffolk, 2007 U.S. Dist. LEXIS, at 30-32 (E.D.N.Y. June 27, 2007)............31

Frankel v. Frankel, 2003 U.S. Dist. LEXIS 2390 (N.D. Ill. 2003)...............................................22

Germain v. The Connecticut National Bank, 988 F.2d 1323 (2d Cir. 1993)................................22

Gibli v. Kadosh, 717 N.Y.S.2d 553 (1st Dep't 2000) ...................................................................31

Kidder, Peabody & Co. v. Maxus Energy Corp., 925 F.2d 556 (2d Cir. 1991) .....................15, 16

Kiska Construction Corp. v. G&G Steel, Inc., 2005 U.S. Dist. LEXIS 9821 (S.D.N.Y. May 20, 2005).............................................................................................................................30, 31

In re New Times Securities Services Inc., 371 F.3d 68 (2d Cir. 2004) ........................................29

Parametric Capital Management, LLC v. Lacher, 791 N.Y.S.2d 10 (1st Dep't 2005) .................25

Patterson v. Shumate, 504 U.S. 753 (1992)..................................................................................30

Pereira v. United Jersey Bank, N.A., 201 B.R. 644 (B.S.D.N.Y. 1996).........................24

Roth v. Jennings, 489 F.3d 499 (2d Cir. 2007)...............................................21

SIPC v. SJ Salmon & Co., No. 72 Civ. 560 (S.D.N.Y. 1972).................................20, 21

Spallone v. United States, 493 U.S. 265 (1990)..............................................28

The Pedre Co. v. Robins, 901 F. Supp. 660 (S.D.N.Y. 1995).................................25

Theede v. U.S. Department of Veterans' Affairs, 1993 U.S. App. LEXIS 16859 (9th Cir. June 21, 1993).............................................................................27

United States Commodity Futures Trading Commission v. NRG Energy, Inc., 457 F.3d 776 (8th Cir. 2006)........................................................................27

## STATUTES

17 C.F.R. § 300.300...........................................................................28

11 U.S.C. § 541(b)(7)(I).....................................................................30

11 U.S.C. § 544..............................................................................30

11 U.S.C. § 547(b)...........................................................................23

11 U.S.C. § 547........................................................................23, 24, 25

15 U.S.C. § 78eee(b)(2)......................................................................26

15 U.S.C. §78fff-2(c)(2)...........................................................17, 18, 20, 28, 29

15 U.S.C. § 78fff-3(a)..................................................................18, 19, 28

15 U.S.C. § 78fff-4(c).......................................................................27

15 U.S.C. § 78lll(11)....................................................................27, 28

28 U.S.C. § 158(a)(1)........................................................................7

29 U.S.C. § 1001............................................................................30

29 U.S.C. § 1144(a).........................................................................30

iv

Helen Davis Chaitman (4266)
Phillips Nizer LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
*Attorneys for Plaintiff/Appellants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------:

DIANE and ROGER PESKIN, and　　　　　:
MAUREEN EBEL,　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Appellants,　　　　:　　09 Civ. 8730 (JGK)
　　　　vs.　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
IRVING H. PICARD, as Trustee for the　　　:
Liquidation of Bernard L. Madoff Investment　:
Securities LLC　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Appellee.　　　　　:
---------------------------------------------------------------x

## PLAINTIFFS/APPELLANTS' MEMORANDUM OF LAW ON APPEAL FROM BANKRUPTCY COURT'S DISMISSAL OF COMPLAINT

Plaintiffs/Appellants Diane Peskin, Roger Peskin and Maureen Ebel ("plaintiffs")

respectfully submit this memorandum of law on their appeal of the orders of the Bankruptcy

Court dated September 10, 2009 and September 11, 2009 (together, the "Order"), which granted

defendant's motion to dismiss the complaint. The plaintiffs were customers of Bernard L.

Madoff Investment Securities, LLC ("Madoff"). Defendant/Appellee is the Trustee for the

liquidation of Madoff appointed at the request of the Securities Investor Protection Corporation

("SIPC") which, by law, is required to insure customer accounts up to $500,000 against the

dishonesty of an SEC-regulated broker/dealer such as Madoff pursuant to the explicit and

unambiguous terms of the Securities Investor Protection Act ("SIPA").

1

## PRELIMINARY STATEMENT

### Background of This Case

This case arises in the context of SIPC and the Trustee violating the express provisions of SIPA in the face of claims of Madoff customers which exceed SIPC's net assets. Over the course of its 38-year existence, SIPC repeatedly promised customers of SEC-regulated broker/dealers that, if it turned out they dealt with a thief, SIPC would promptly replace securities up to $500,000 as reflected on the customers' last statements. As of December 31, 2008, SIPC had assets of $1.7 billion and it was facing a loss in the Madoff case of approximately $2.5 billion.[1] SIPC had two choices: it could draw on the $2 billion lines of credit available to it under SIPA and fulfill its statutory obligations; or it could default on its obligations, leaving thousands of destitute Madoff investors and their families without funds to support themselves. SIPC chose to default.

During the entire period of Wall Street's boom years from 1996 through 2008, SIPC provided essentially free SIPC insurance to its members. During that 12-year period, SIPC charged the SEC-regulated broker/dealers a mere $150 per year per firm for the privilege of printing on hundreds of billions of dollars of trade confirmations that the customer's account was insured up to $500,000 by SIPC. The promise of SIPC insurance induced innocent investors to entrust their life savings to SIPC's members, allowing them to hold the investors' securities in street name.[2]

---

[1] The Trustee has announced to the public that, of the 4,903 active accounts that Madoff had as of December 11, 2008, only 2,335 customers actually lost money on the Trustee's net investment calculation, even though the November 30, 2008 balances on all the accounts totaled $64.8 billion. Thus, he has reduced by half SIPC's exposure. Appellants' Appendix ("Appendix"), Exh. X. *See also*, SIPC's 2008 Annual Report indicating that, with administrative expenses, the total Madoff loss would cost SIPC $1.4 billion. Appendix Exh. I at 18.

[2] Appendix Exhs. I at 9, B, C, D, E.

2

SIPC repeatedly ignored warnings from Congress that it was under-funded and would not be capable of handling a major liquidation.[3] Yet, when Bernard Madoff confessed on December 11, 2008, instead of drawing on the statutory lines of credit available to SIPC so that it could fulfill its obligations to Madoff's customers, SIPC decided to cheat the customers out of their promised insurance in order to enrich its own members. This has left the customers, many of whom are elderly, unwell, and unable to support themselves, in dire financial straits.[4]

SIPC's bait-and-switch is a violation of SIPA. SIPC's President, Stephen Harbeck, personally represented to the court in a 2000 SIPA liquidation that, where a customer invested with a Ponzi schemer who took the customer's money and never purchased the securities reflected on the customer's statement, SIPC would replace the securities even if they had tripled in value. As Mr. Harbeck acknowledged, if customers are led to believe that "real, existing" securities had been purchased for their accounts, then those customers are entitled to get the full value of their securities positions as of the filing date, even if the securities had never been purchased:

> MR. HARBECK: **Even if they're not there**.
>
> THE COURT: Even if they're not there.
>
> MR. HARBECK: Correct.
>
> THE COURT: **In other words, if the money was diverted, converted –**
>
> MR. HARBECK: And the **securities were never purchased.**
>
> THE COURT: Okay.
>
> MR. HARBECK: **And, if those positions triple, we will gladly give the people their securities positions.**[5]

---

[3] Appendix Exhs. C and E.
[4] Appendix Exh. Z, at ¶¶2-8.
[5] Appendix Exh. A (emphasis added).

3

In a February 26, 2003 News Release available on SIPC's website, Harbeck bragged about SIPC's prompt replacement of securities for investors in the Park South liquidation:

> The Park South case is a textbook illustration of why Congress created SIPC to protect investors at troubled brokerage firms. While misuse of customer cash and securities is uncommon, it is important for investors to know that SIPC is here as a safety net when they need us in those situations. SIPC's mission also was met here in terms of making sure that more than 2,000 Park South investors were not further victimized by having their assets tied up for months or longer in a bankrupt brokerage firm.[6]

Just five days after Madoff's confession, on December 16, 2008, Josephine Wang, the General Counsel of SIPC, consistent with SIPC's conduct for 38 years, assured the public that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.[7]

Yet, despite SIPC's repeated representations of coverage, and the representations of coverage which continue to be made to this day by SIPC's members,[8] all of which induced the American public to entrust their life savings to Wall Street, SIPC is taking the position in this case – for the first time in its history – that it only insures the net investment of the investor, regardless of how long the investor had his account.

Consistent with the decision of SIPC and the Trustee to disregard the SIPA requirement that Customers' claims be based upon their last statements from Madoff, the Trustee ignored the statutory mandate that he "promptly" pay SIPC insurance to customers and, instead, the Trustee embarked upon a year-long forensic analysis of Madoff's records to determine the net

---

[6] http://www.sipc.org/media/release26feb03.cfm; emphasis added.

[7] Appendix Exh. F.

[8] *See, e.g.,* Appendix Exh. H.

investment in each account, going back generations to net out a family's investment over 20 – 30 years. In the process, as set forth in detail in the Complaint, the Trustee's lawyers misrepresented the law to destitute customers who were not represented by counsel and induced concessions of their legal rights from them.

## The Complaint

Plaintiffs are three Madoff customers who invested their life savings in Madoff and depended upon their periodic withdrawals from their Madoff accounts to fund their daily living expenses. On December 11, 2008, their source of livelihood was terminated. They were left without any source of income to support themselves or their families.

In this context, the SIPA statutory scheme requires the prompt replacement of securities, up to a value of $500,000, so that the customers' investments are relatively uninterrupted. Yet the Trustee delayed for eight months before paying the plaintiffs the SIPC insurance which they were entitled to receive "promptly."

Plaintiffs alleged two claims for relief in the Complaint: declaratory judgment and breach of fiduciary duty. The declaratory judgment claim sought a declaration that:

(a)     The Trustee was obligated to recognize plaintiffs' claims in the amount of their "net equity" as defined by SIPA, *i.e.*, the balance shown on their November 30, 2008 statements;

(b)     The Trustee was obligated to promptly pay investors up to $500,000 in SIPC insurance based upon their November 30, 2008 statements;

(c)     The Trustee has no right to assert preference claims against plaintiffs or to deduct from their SIPC payments the amount of any payments received by them within 90 days of the institution of the Madoff liquidation; and

5

(d)     The Trustee extracted from Mrs. Ebel, under duress, an acknowledgment that her claim for her IRA account is limited to the amount of her net investment and that, therefore, her acknowledgment is void.  Appendix Exh. J ("Complaint") at 23-24.

The breach of fiduciary duty claim alleged that the Trustee had breached his fiduciary duty as a trustee to promptly pay plaintiffs' claims, and that plaintiffs had suffered damages as a result of such breach.  This claim also alleged that the Trustee's attorneys misrepresented the law to plaintiffs, at a time when they were not represented by counsel, in order to induce them to forfeit some of their statutory rights.  Complaint ¶¶ 85-86, 100-106, p. 24.

**The Error of the Bankruptcy Court in Dismissing the Complaint**

The Bankruptcy Court erred in dismissing the plaintiffs' declaratory judgment claim simply because the Court disposed of the first of the four declaratory judgment issues by setting a briefing schedule, for all customers, to resolve the "net equity" issue (a procedure to which the plaintiffs had no objection).  While this procedure resolved the first of four issues on which plaintiffs sought a declaratory judgment, it did not resolve the remaining three issues.  Plaintiffs' claim for a declaratory judgment as to items "b," "c," and "d" above states a claim that is ripe for determination and should not have been dismissed.

Similarly, the Complaint stated a claim against the Trustee for breach of fiduciary duty, based on the Trustee's failure to pay claims promptly and based upon the uncontested sworn declarations of plaintiffs that the Trustee's counsel had misrepresented the law to plaintiffs at a time when they were not represented by counsel.  There was no basis to dismiss this claim because the alleged breaches extended beyond the Trustee's defiance of SIPA's definition of "net equity."

6

## STATEMENT OF THE BASIS FOR APPELLATE JURISDICTION

The Order is a final order of the Bankruptcy Court over which this Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1)[9], which provides that "the district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders and decrees," of bankruptcy judges.

## STATEMENT OF THE ISSUES PRESENTED
## AND APPLICABLE STANDARD OF APPELLATE REVIEW

### Issues on Appeal

Plaintiffs seek a ruling of this Court that:

1.     The Bankruptcy Court erred in dismissing that portion of the Complaint which sought a declaratory judgment that the Trustee had violated the mandate, under SIPA, that he "promptly" pay customer claims.

2.     The Bankruptcy Court erred in dismissing, for lack of ripeness, plaintiffs' claim for breach of fiduciary duty when the Complaint alleged (a) that the Trustee had deliberately delayed for eight months the payment to plaintiffs of the SIPC insurance which they are statutorily entitled to receive "promptly"; (b) that the Trustee's counsel had misrepresented the law to plaintiffs in order to induce them to forfeit their statutory rights; and (c) that the plaintiffs had suffered substantial damages as a result of the Trustee's conduct.

3.     The Bankruptcy Court erred in finding that plaintiffs' assertion of claims under SIPA violated the Court's December 23 Order (the "Claims Procedure Order").

4.     The Bankruptcy Court erred in dismissing plaintiffs' claim for a declaratory judgment that the Trustee had no right to assert preference claims against them.

---

[9] Pursuant to Federal Rule of Bankruptcy Procedure 8010(b), a copy of the relevant part of this statute and other statutes is attached hereto as an addendum.

7

5. The Bankruptcy Court erred in dismissing Mrs. Ebel's claim for a declaratory judgment that the Trustee had extracted from her, under duress, an acknowledgment that her claim for her IRA account was limited to the amount of her net investment.

## Standard of Review

This Court has *de novo* review of the legal conclusions of the Bankruptcy Court. *See In re AroChem Corp.*, 176 F.3d 610, 620 (2d Cir. 1999).

## STATEMENT OF THE CASE

### Nature of the Case, Course of the Proceeding and Disposition By Court Below

On December 11, 2008, Bernard L. Madoff was arrested and charged with securities fraud in a criminal proceeding and the SEC filed a civil complaint against him. Appendix Exh. U ("Order") at 4-5. On December 15, 2008, SIPC filed an application in the civil case for a decree that Madoff's customers were entitled to SIPA protection. The District Court granted the application, entered an order placing Madoff's customers under the protection of SIPA, appointed the Trustee at the recommendation of SIPC, and remanded the case to the Bankruptcy Court. *Id.* at 5.

On December 23, 2008, the Bankruptcy Court entered the Claims Procedure Order which required the Trustee to determine customer claims based upon the customer's "net equity," defined in SIPA as the customer's last statement. Appendix Exh. G ("Claims Procedure Order").

Plaintiffs' claims arise from the Trustee's violation of his statutory obligations under SIPA and the breach of his fiduciary duty to Madoff's customers. The Trustee moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and 12(b)(1), or in the alternative to strike certain allegations therein, on or about July 17, 2009. SIPC submitted a brief and affidavit in support of the Trustee's motion. Plaintiffs submitted their papers in opposition

8

to the motion to dismiss and in support of a cross motion for partial summary judgment on the net equity portion of their claim on August 10, 2009, incorporating declarations of each of the plaintiffs which had been submitted earlier in opposition to the first interim fee applications of the Trustee and his counsel. In an August 12, 2009 memorandum endorsement, the Bankruptcy Court struck plaintiffs' partial summary judgment motion and granted plaintiffs leave to resubmit their papers without the summary judgment motion by August 17, 2009. On August 17, 2009, plaintiffs filed a revised set of motion papers, without cross-moving for summary judgment. On or about August 27, 2009, the Trustee submitted reply papers.

Oral argument on the motion occurred on September 9, 2009. *See* Appendix Exh. T. On September 10, 2009, the Bankruptcy Court granted the Trustee's motion and dismissed the Complaint in its entirety on the ground that the issue of the proper definition of "net equity" should be determined through a separate briefing process. Order at 12-14. The Court further held that plaintiffs' declaratory judgment claim regarding the net equity issue was barred by the Claims Procedure Order, which set forth a procedure for adjudication of claims against Madoff. Order at 10. In addition, the Court held that the claim for a declaratory judgment that the Trustee was not entitled to assert preference claims against plaintiffs or deduct such claims from their SIPC insurance payments was not ripe because the Trustee asserted that he did not intend to assert such claims. Order at 15. Finally, the Court held that the breach of fiduciary duty claim should be dismissed as premature in light of the net equity briefing, and could be reasserted pending the outcome of the net equity issue. Order at 15-16. The Court did not deal at all with plaintiffs' allegations, supported by their own undisputed declarations, that the Trustee's counsel had misrepresented the law to them in order to induce them to forfeit their statutory rights.

The Bankruptcy Court filed an Errata Order on September 11, 2009. A timely notice of appeal to this Court was filed on September 18, 2009. *See* Appendix Exh. W.

## STATEMENT OF FACTS

### The Peskins' Investment in Madoff

Roger Peskin began publishing the Art Now Gallery Guide (the "Guide") in 1970. He began with one editorial assistant and built up the Guide to become the most comprehensive source of information on gallery and museum exhibitions in major cities across the United States. At times, the Guide was published in Europe, South America and Japan. Complaint ¶¶ 25-26; Declaration of Roger Peskin ¶¶ 2-4 (Appendix Exh. N).

The Guide was sold in August 2004 and the Peskins invested the after-tax proceeds of the sale, along with the proceeds of two properties they sold, into Madoff. At the time of the Peskins' investment in Madoff, (a) Madoff had been in business for over 40 years; (b) Madoff's trading strategy was known to be diversified and conservative; and (c) the SEC had investigated Madoff seven times over an 11-year period and had publicly vouched for his honesty. On or about October 18, 2005, the Peskins invested $2,586,412.99 into Madoff. In early May 2008, the Peskins invested $181,000 into Madoff. On or about November 12, 2008, the Peskins invested $470,265.98 into Madoff. Complaint ¶¶ 27 - 32.

During the years of their investment in Madoff, the Peskins earned 9 – 11% each year, in short term capital gains, subject to the highest tax rate. In the ordinary course, the Peskins regularly withdrew funds from the Madoff account to fund family living expenses, to pay taxes on their Madoff income, and for special expenditures. *Id.* ¶¶ 36-37.

On September 15, 2008, the Peskins received a check from Madoff for $50,000. On October 1, 2008, the Peskins received a check from Madoff for $33,000. On November 6, 2008, the Peskins received a check from Madoff for $30,000. On November 12, 2008 the Peskins

10

invested $470,265.98 with Madoff. As of November 30, 2008, the last month for which the Peskins received a Madoff account statement, the value of their account was $3,247,367.40. *Id.* ¶ 42. At no time did the Peskins have any reason to believe that Madoff was dishonest. *Id.* ¶¶ 38-41, 45.

Following December 11, 2008, the Peskins' sole source of income was cut off and they had virtually no funds to provide for themselves and their children. They had no funds to make their regular monthly payments, pay tuition for their children's school, or fund other obligations. Appendix Exh. N ¶ 19.

The Peskins filed a SIPC claim on February 19, 2009. They received no response to their claim until June 3, 2009 when they were contacted by one of the Trustee's attorneys who informed them that they were entitled to receive $387,000 as their full SIPC payment (instead of $500,000) because the Trustee was entitled to deduct from their SIPC payment the $113,000 that they withdrew from their Madoff account in the three months preceding December 15, 2008. Complaint ¶¶ 43 – 44.

The Peskins pointed out to the attorney that, although they had withdrawn $113,000 in the 90 days before December 15, 2008, they had also invested $470,265.98 on November 12, 2008. Thus, their net position in the 90 days before the liquidation was positive $357,265.98. They asked the attorney if they weren't entitled to the full $500,000 in SIPC insurance since they had invested more than they withdrew in the last 90 days. They were told that the law was absolutely clear that they were not entitled to a credit for money they deposited after their last withdrawal. This statement by the Trustee's counsel was a misrepresentation of the law. *Id.* ¶¶ 45-46; Appendix Exh. N ¶¶ 21-24. The Peskins also asked the Trustee's counsel if the $113,000 that SIPC was deducting from their insurance would be put into a fund for distribution to

11

customers or whether it would simply save SIPC money. They were told by the Trustee's counsel that it would simply save SIPC money. Appendix Exh. O ¶ 9.

**Maureen Ebel's Investment in Madoff**

Maureen Ebel was widowed in 2000, after a 27-year marriage. Mrs. Ebel worked as a nurse for the first fifteen years of her marriage, but stopped working in 1989. Complaint ¶¶ 47-48. In 2003, a relative recommended that Mrs. Ebel invest all of her funds with Madoff, and told her that Madoff had been in existence for more than 25 years; that he had been approved by the SEC; and that he had a very conservative investment strategy. Mrs. Ebel opened two accounts with Madoff. The first account was a direct IRA account in which she invested $1,348,877.12 on February 24, 2003. Mrs. Ebel never withdrew any funds from this account and it had a balance on November 30, 2008 of $2,532,140.66. Mrs. Ebel also opened a direct investment account with Madoff in which she invested a total of $3,831,387.49 beginning on March 17, 2003 and ending on July 23, 2004. The balance in this account as of November 30, 2008 was $4,729,125.04. *Id.* ¶¶ 49-51.

Mrs. Ebel withdrew funds from her direct investment account, which was her sole source of income, on a regular basis and utilized the funds to provide support for herself and her family, to pay for the educational expenses of family members, and to fund charitable donations. As part of her normal withdrawal of funds from her account, on September 15, 2008 Mrs. Ebel received a $102,000 check from Madoff dated September 11, 2008. She deposited the check in her account on September 15, 2008. *Id.* ¶¶ 54-55.

After December 11, 2008, Mrs. Ebel found herself with no source of income and was forced to return to the workforce in order to support herself. She worked as a house maid; she worked as a caretaker for an elderly patient; she worked as a driver; she worked at a cash register; she worked in a ladies' clothing store. In short, she did anything she could to earn

money to pay her living expenses. However, having been out of the workforce for nearly 20 years, she could not find work that could sustain her standard of living. She has been forced to sell a car, jewelry, household items, and a condominium in Florida she had owned since 1984, all at greatly depressed prices because she needed money to live on. Had she promptly received her SIPC insurance, she would have been able to avoid such losses. *Id.* ¶ 56.

Mrs. Ebel filed her SIPC claim for both accounts on February 14, 2008. She heard nothing from the Trustee until May 20, 2009 when she received a determination letter requiring that she acknowledge that her claim with respect to the IRA account was for only $1,348,877.12, the amount of her original investment. She was informed that it was a pre-condition to her receiving SIPC insurance on this account for her to acknowledge that she was not entitled to a claim for any appreciation in the account. Because Mrs. Ebel was financially desperate, she had no alternative but to accede to the Trustee's demand. She signed the required acknowledgments and, on June 6, 2009, she received $500,000 from SIPC with respect to this account. *Id.* ¶¶ 57-58.

With respect to the direct investment account, the determination letter indicated that she was only entitled to $398,000 in SIPC insurance because the Trustee was entitled to deduct the $102,000 payment she received in September 2008. Thereafter, she had several communications with one of the Trustee's attorneys. She was told that the Trustee was obligated under the law to withhold $102,000 from her SIPC payment. She was also told that this money would simply reduce SIPC's obligations; the money would not be used to pay other investors. *Id.* ¶ 59-60.

Mrs. Ebel asked if she could accept the $398,000 check and yet reserve her right to claim the $102,000 that the Trustee was going to withhold. She was told that she could not do so; if

13

she wanted the check for $398,000, she would have to relinquish her claim to the $102,000. She explained that she was uncertain whether she should waive her claim to the $102,000. *Id.* ¶ 61.

On May 29, 2009, Mrs. Ebel received another phone call from the Trustee's attorney with whom she had been speaking. He told her that there had been a change in the Trustee's strategy and that she would not have to relinquish her claim to the $102,000 if she accepted the $398,000. She was told that she would be sent a revised determination letter and accompanying documents. As of the date the Complaint was filed, June 10, 2009, she had not received the check for $398,000. *Id.* ¶ 62.

With respect to each of their accounts, every month Mrs. Ebel and the Peskins received from Madoff trade confirmations indicating the purchase and sale of Fortune 100 company stocks; the purchase and sale of Treasury securities; and the purchase and sale of options to hedge the securities positions. In addition, they received monthly account statements showing the securities positions. In each instance, the trade confirmations and account statements reflected the purchase and sale of securities of Fortune 100 companies at prices consistent with those reported in the media. *Id.* ¶¶ 33-35, 52–53.

**ARGUMENT**

**I.     THE BANKRUPTCY COURT ERRED IN DISMISSING PLAINTIFFS' CLAIM FOR A DECLARATORY JUDGMENT THAT THE TRUSTEE HAD NO RIGHT TO ASSERT PREFERENCE CLAIMS AGAINST THEM**

In dismissing plaintiffs' claim for a declaratory judgment that the Trustee had no right to assert preference claims against them or deduct such amounts from their SIPC insurance, the Bankruptcy Court held that this claim was not ripe because the Trustee finally acknowledged, two months after the Complaint was filed, that the Peskins had never received a preferential transfer and because the Trustee had agreed to pay Mrs. Ebel the full $500,000 SIPC advance

14

despite her receipt of a transfer during the preference period. Order at 15. The Court further held that the preference issue "should be dealt with either under its own separate briefing schedule . . . or, if and when Defendant brings a preference action, under the Bankruptcy Code." *Id.*

The Bankruptcy Court erred by relying on the Trustee's assertion that he would not assert preference claims against plaintiffs, particularly because, in its decision, the Court recognized that the Trustee might bring a preference action against the plaintiffs. *Id.* Moreover, the Partial Assignment and Release document the Trustee required the plaintiffs to sign contained a release by the plaintiffs of the Trustee and SIPC but no mutual release by the Trustee and SIPC of claims against the plaintiffs. Exhs. B, D, E, H to Appendix Exh. L.

The Second Circuit dealt with this precise issue in *Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir. 1991). There, the Court held that the District Court had properly rendered a declaratory judgment as to whether the defendant could assert securities claims against plaintiff, despite the fact that defendants had "committed never to assert these claims" against plaintiff. *Id.* The Court explained its reasoning as follows:

> [Defendant] contends, however, that [plaintiff's] claims under sections 10(b) and 14(e) of the 1934 Act died and the parties lost a legally cognizable interest in their resolution when [one defendant] for itself and [another defendant] committed never to assert these claims against [plaintiff]. A controversy ceases to be "real and immediate" when "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." . . . **Where the defendant voluntarily ceases the conduct at issue, however, the declaratory action is not necessarily mooted. . . .** Here, [defendant] asserted that it would not bring an action grounded in the federal securities laws against [plaintiff]. This is not a case where the parties have entered into a settlement, . . . , or where the defendant has "entered into a binding, judicially enforceable agreement." . . . In those situations, the claims inarguably were moot. **By contrast, [defendant] attempts to unilaterally bar [plaintiff's] claims for declaratory relief simply by representing that it will not bring an action under the federal securities laws.**
>
> Without a declaratory judgment, [defendant] again could put [plaintiff] to the task of defending against the federal securities claims. . . A judicial declaration that

15

[defendant] is barred from asserting the 1934 Act claims would both settle the matter between these parties once and for all and dispel all uncertainty regarding the liability of [plaintiff] for these claims.

*Kidder, Peabody & Co.*, 925 F.2d at 562-563 (emphasis added; citations omitted).

Here, just as in *Kidder, Peabody & Co.*, there is no "binding, judicially enforceable agreement" preventing the Trustee from asserting preference claims against the plaintiffs. Indeed, the Bankruptcy Court noted that the Trustee could litigate his preference claims against plaintiffs when it stated that the issue could be determined "*if and when Defendant brings a preference action.*" Order at 15.

Under *Kidder, Peabody & Co.*, there is no requirement that plaintiffs wait to see "if and when Defendant actually brings a preference action." There is an actual controversy between plaintiffs and the Trustee *now* regarding the Trustee's ability to assert preference claims against plaintiffs. The plaintiffs have the right to have this controversy adjudicated *now* and the Trustee cannot "unilaterally bar" adjudication by making potentially empty promises.

Because there is an actual controversy between the parties, the Bankruptcy Court's dismissal of plaintiffs' declaratory judgment claim regarding preferences on the ground that the dispute was not "ripe" was erroneous and should be reversed. *See Bank of American National Trust and Savings Assoc. v. Private Trust Corp.*, 1998 U.S. Dist. LEXIS 6353, at *7-9 (S.D.N.Y. May 6, 1998) (holding declaratory judgment action is "ripe" where, as here, it involves an actual case or controversy.); *see also Brooks v. Flagg Brothers, Inc.*, 63 F.R.D. 409, 413 (S.D.N.Y. 1974) (holding that, although defendant promised not to sell plaintiff's furniture, the threat that the furniture might be sold in the future made plaintiff's claim a case or controversy for purposes of declaratory judgment action).

16

## II. THE BANKRUPTCY COURT ERRED IN DISMISSING PLAINTIFFS' CLAIM FOR A DECLARATORY JUDGMENT THAT THE TRUSTEE VIOLATED HIS STATUTORY MANDATE TO PROMPTLY PAY CUSTOMER CLAIMS

The Bankruptcy Court erred in dismissing that portion of the Complaint which sought a declaratory judgment that the Trustee had violated SIPA's mandate that he "promptly" pay customer claims. The Order does not even address this claim for relief, although it is clearly alleged. *See* Complaint at 24. The Order only addresses the allegations that the Trustee did not act promptly in paying SIPC advances in connection with the breach of fiduciary duty claim, but not the declaratory judgment claim. Order at 16.

This Court should reverse the Bankruptcy Court's dismissal of this portion of plaintiffs' declaratory judgment claim. It cannot be disputed that, totally unprecedented in SIPC's history, the Trustee delayed for eight months in paying the plaintiffs, whose claims he ultimately could not dispute. The Trustee embarked upon a totally unnecessary but massive investigation of Madoff's records to determine the net investment over two or three generations of Madoff customers so that SIPC would only have to pay insurance for the Customer's net investment over generations. This is not what Congress had in mind. Congress made absolutely clear its intent to minimize the devastation to customers of an insolvent broker/dealer through prompt payment of SIPC insurance.

GENERAL PROVISIONS OF A LIQUIDATION PROCEEDING

**(a) PURPOSES**

The purposes of a liquidation proceeding under this chapter shall be—

(1) **as promptly as possible** after the appointment of a trustee in such liquidation proceeding, and in accordance with the provisions of this chapter—

(A) to deliver customer name securities to or on behalf of the customers of the debtor entitled thereto as provided in §78fff-2(c)(2) of this title; and

17

(B) to distribute customer property and (in advance thereof or concurrently therewith) otherwise satisfy net equity claims of customers to the extent provided in this section.

**PAYMENT TO CUSTOMERS.-SIPC shall promptly satisfy all obligations of the member to each of its customers relating to, or net equity claims** based upon, securities or cash by the delivery of securities or the effecting of payments to such customer (subject to the provisions of section8 (d) and section **9** (a) ) insofar as such obligations are ascertainable from the books and records of the member or are otherwise established to the satisfaction of SIPC.

15 U.S.C. §78fff-2(c)(2); emphasis added. *See also,* 15 U.S.C. § 78fff-3(a).

Congress intended for the trustee to promptly pay customer claims based upon the debtor's books and records, without the filing of proofs of claim:

**[SIPA] establishes procedures** for prompt orderly liquidation of SIPC members when required and **for making prompt distributions and payments on account of customers' claims without need for formal proofs of claim.**

\*     \*     \*

The committee also believes that **it is in the interest of customers of a debtor that securities held for their account be distributed to them as rapidly as possible in order to minimize the period during which they are unable to trade and consequently are at the risk of market fluctuations.**

\*     \*     \*

**Because of the difficulties involved in filing proofs of claim . . ., the bill provides in general for the trustee to make payments and deliveries based upon the books and records of the debtor or when otherwise established to his satisfaction, without requiring customers to file proofs of claim.**

*See* S. Rep. 91-1218, at 10, 11, 12 (1970), *reprinted in* Federal Securities Laws Legislative History 1933-1982, Vol. IV, at 4642, 4643, 4644 (1983), emphasis added.

Thus, as the Sixth Circuit explained in *Bell & Beckwith v. McGraw,* 937 F. 2d 1104, 1106-1107 (6th Cir. 1991):

18

Implementing this statutory scheme is complicated by the congressional requirement that SIPC make prompt payments to customers. These payments take the form of advances which are used to satisfy customer claims:

> SIPC would advance to the trustee such sums from the SIPC fund as would be necessary to provide for prompt payment of claims of customers of the debtor, but only to the extent of [$500,000] for each customer. This significant provision will make it possible for public customers to receive promptly that to which they are entitled without the delay entailed in waiting for the liquidation proceeding to be completed. In addition, and subject to the limitation of [$500,000, of which not more than $100,000 may be in satisfaction of a claim based on cash], public customers of the broker-dealer would receive back 100 percent of that to which they are entitled.

House Report at 5262; 15 U.S.C. Sec. 78fff-3. SIPC makes such advances prior to a determination of each customer's ratable share of or distribution from the customer property fund.

The Bankruptcy Court, itself, has recognized Congress' intent that SIPC proceedings be conducted quickly in order to minimize the devastation to customers:

> Congress itself has commanded **swift** action. For example, the SEC and self-regulatory organizations are required to "**immediately notify**" SIPC of concerns about the financial stability of a SIPC member. 15 U.S.C.A. § 78eee(a)(1). A Court determining that a protective decree is warranted must "**forthwith**" appoint a trustee, 15 U.S.C.A. § 78eee(b)(3), and remove the case to a Court with jurisdiction over bankruptcy cases. 15 U.S.C.A. § 78eee(b)(4). The trustee is required to investigate the operation of the debtor's business and report its results to SIPC "**as soon as practicable.**" 15 U.S.C.A. § 78fff-1(d). Among the stated purposes of a liquidation proceeding is to make customers whole "**as promptly as possible after the appointment of a trustee," 15 U.S.C.A. § 78fff(a), who is required to "promptly discharge** . . all obligations of the debtor to a customer relating to securities." 15 U.S.C.A. § 78fff-2(b). **SIPC fund moneys must be advanced to the trustee up to certain limits "to provide for prompt payment and satisfaction of . . . claims of customers." 15 U.S.C.A. § 78fff-3(a). Congress has commanded customer damages to be repaired promptly.**

*In re Donald Sheldon & Co., Inc.*, 153 B.R. 661, 667 (B. S.D.N.Y. 1993); emphasis added.

The Claims Procedure Order entered by the Bankruptcy Court in the Madoff liquidation specifically incorporates the time periods mandated by SIPA. It states:

19

ORDERED, that the Trustee be, and he hereby is, authorized to satisfy, **within the limits provided by SIPA**, those portions of any and all customer claims and accounts which agree with the Debtor's books and records, or are otherwise established to the satisfaction of the Trustee pursuant to 15 U.S.C. §78fff-2(b), provided that the Trustee believes that no reason exists for not satisfying such claims and accounts

Appendix Exh. G at 5; emphasis added.

The Trustee's failure to fulfill his statutory obligations is shown by the contrast between the treatment of customers by the FDIC and the treatment of customers in this case. As stated in the legislative history of SIPA:

The intention of SIPC, like the FDIC, is to minimize losses to and to maintain public confidence in the institutions the public deals with.

S. Rep. 91-1218, at 9, *reprinted in* Federal Securities Laws Legislative History 1933-1982, Vol. IV, at 4641. According to the FDIC's website, "It is the FDIC's goal to make deposit insurance payments within two business day[s] of the failure of the insured institution." *See* http://www.fdic.gov/consumers/banking/facts/payment.html.

While SIPC has never asserted that it could replace investors' securities within 48 hours, it has set a standard of doing so within two to three months. In *SIPC v. SJ Salmon & Co.,* No. 72 Civ. 560 (S.D.N.Y. 1972)[10], 1500 out of 2000 claims had been paid within a few months. The court wrote:

This action was instituted early this year and the trustee is proceeding with all due speed in his investigation and orderly liquidation of the business of the defendant. Approximately 2,000 claims have been filed; securities and cash have been returned to some 1,500 customers as either specifically identifiable property or as payment of the portion of "net equities" in the single and separate fund representing free credit balances. This clearly indicates that the trustee is proceeding as swiftly as the circumstances of the case permit and negates any suggestion that he is guilty of unnecessary delay or dilatory tactics in the performance of his duties.

---

[10] Exh. A to Appendix Exh. M.

As recently as November 2007, Stephen Harbeck, the President of SIPC, stated to the press that "[t]he fastest that an investor could conceivably get back in control of one's account is one week" but he added that "In most situations, it takes two to three months." www.kiplinger.com/printstory.php?pid=12842. The article further stated that "the process can stretch out even longer if the brokerage firm kept shoddy records. *Id.*

Madoff's records were certainly not shoddy. On the contrary, the Trustee has been able to precisely reconstruct investors' net investments going back into the 1980's. As the Complaint alleges, the Trustee could have paid all investors claims within three months pursuant to their November 30, 2008 statements. Complaint ¶ 79. Yet, more than eleven months after the institution of this case, the Trustee has determined only 1,590 claims out of at least 15,400 claims filed. *See* http://www.madofftrustee.com/Status.aspx. Thus, plaintiffs' claim for a declaratory judgment that the Trustee is obligated to pay SIPC advances promptly should not been dismissed since the claim was plainly "plausible on its face." *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). *See also Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (on 12(b)(6) motion, the court "is normally required to look only to the allegations on the face of the complaint.").

## III. THE BANKRUPTCY COURT ERRED BY DISMISSING PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIM

### A. The Trustee Owes a Fiduciary Duty to Customers

The Bankruptcy Court also erred in dismissing for lack of ripeness plaintiffs' claim for breach of fiduciary duty. It is indisputable that the Trustee owes a fiduciary duty to Customers. *See In re Adler, Coleman Clearing Corp.*, 1998 Bankr. LEXIS 1076, at *47 (B. S.D.N.Y. Aug. 25, 1998) ("The parties agree that a SIPA trustee owes a fiduciary duty to the customers and creditors of a liquidating broker dealer akin to the fiduciary duty a bankruptcy trustee owes a

21

debtor's estate and creditors"); *Germain v. The Connecticut National Bank*, 988 F. 2d 1323, 1330 n. 8 (2d Cir. 1993). The Court in *In re Adler, Coleman Clearing Corp.* held that a SIPC trustee could be "held personally liable for knowing, intentional and/or negligent breaches of his fiduciary duties." 1998 Bankr. LEXIS 1076, at *29-30. While the Court in that case dismissed the plaintiff's complaint, it did so because there was no finding that the trustee had breached his statutory duties. However, the court noted that **even SIPC itself** could be "sued when it is not acting in good faith in executing its statutory rights and obligations." 1998 Bankr. LEXIS 1076, at *99.

## B. The Trustee Breached His Fiduciary Duty to the Plaintiffs

The Complaint alleged, and the plaintiffs' declarations verified, that the Trustee acted in bad faith to enrich SIPC, the insurer, at the expense of the customers, the insureds, to whom the Trustee owed a fiduciary duty. The Trustee injured the Plaintiffs in two ways: he delayed paying them SIPC insurance which caused them substantial monetary damages; and his counsel misrepresented the law to them in order to extract a settlement from them. Appendix Exhs. N ¶¶ 23-24 and P ¶¶15-17: Complaint ¶¶ 102-104. Thus, the claim for bad faith breach of fiduciary duty should not have been dismissed on a Fed. R. Civ. P. 12(b)(6) motion. *See, e.g., Frankel v. Frankel*, 2003 U.S. Dist. LEXIS 2390, at *12 (N.D. Ill. 2003) "[Plaintiff] alleges the existence of a fiduciary duty and a subsequent breach. The court accepts these allegations as true, as it must, and therefore denies the motion to dismiss [Plaintiff's] claim for breach of fiduciary duty."

The Bankruptcy Court erroneously dismissed this claim, confusing it with the "net equity" issue, despite the fact that SIPA imposes two separate obligations on SIPC trustees: First, to promptly pay SIPC insurance to all customers; and second, to determine their claims based upon their "net equity" as defined in the statute. The court incorrectly concluded that the

statutory right to prompt payment of SIPC insurance was dependent upon a judicial determination of the appropriate definition of "net equity."

> Plaintiffs' claim for breach of fiduciary duty should be dismissed because it is premature. Plaintiffs have alleged breach of fiduciary duty claims relating to the alleged failure of the Trustee to promptly pay the SIPC advances and his "invention" of a new definition of net equity. In light of entry of the Scheduling Motion, Plaintiffs' claim for breach of fiduciary duty is not yet ripe. Given that the Plaintiffs' fiduciary duty claim hinges on resolution of the Net Equity Issue, it is only logical that this Court resolve the Net Equity Issue first. In other words, whether the Trustee has breached a fiduciary duty cannot be decided until the appropriateness of the net equity methodology is resolved. Accordingly, this Court will dismiss this portion of the Complaint without prejudice with leave to refile pending the outcome of the Net Equity Issue Determination.

Order, at 15-16 (footnotes omitted).

## C. The Trustee's Counsel Misrepresented the Law to Plaintiffs

The record is undisputed that the Trustee's counsel misrepresented the law to plaintiffs at a time when they were not represented by counsel. Appendix Exhs. N ¶¶ 23-24 and P ¶¶15-17. Aside from the fact that Section 546(e) of the Bankruptcy Code prohibits a trustee from voiding a preferential transfer in connection with a securities contract, the Trustee has no right to reduce SIPC payments by alleged preferential transfers. The purpose of the preference provision of the Bankruptcy Code, 11 U.S.C. § 547, is to assure an equal distribution of the debtor's assets among all creditors. Congress recognized that, in the 90 days before a debtor files in chapter 11, some creditors may be able to exert more pressure on the debtor to pay them on antecedent debt than other creditors and, hence, Congress felt it was equitable to reverse all payments outside of the ordinary course of business, to require creditors who received preferential transfers to return them to the estate for the benefit of all creditors. [11]

---

[11] Thus, 11 U.S.C. § 547(b) provides:
    b)    Except as provided in subsection (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property –
        (1)    to or for the benefit of a creditor;

23

The purpose Section 547 is twofold: first, by permitting the trustee to avoid transfers made within 90 days of a bankruptcy, creditors are discouraged from racing to the courthouse during the debtor's slide into bankruptcy; and second (and more importantly), the preference provision facilitates the bankruptcy policy of equality of distribution among the debtor's creditors by requiring any creditor that received a preferential payment to disgorge that payment so that all creditors of the estate may share equally in the debtor's assets. 5 Collier on Bankruptcy 547.01 (15th ed. 2008); *see also In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 656 (B.S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from racing to the courthouse to dismember the debtor and, "[s]econd, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally") (quotations omitted).

Because of the circumstances here, the "race to the courthouse" rationale is irrelevant. The only relevant purpose here would be to bring money back into the estate so that all the customers can share equally in the debtor's assets. However, that purpose is not being

---

  (2)  for or on account of an antecedent debt owed by the debtor before such transfer was made;
     (3)  made while the debtor was insolvent;
     (4)  made –
  (A)  on or within 90 days before the date of the filing of the petition; or
  (B)  between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
     (5)  that enables such creditor to receive more than such creditor would receive if –
  (A)  the case were a case under chapter 7 of this title;
  (B)  the transfer had not been made; and
(C)  such creditor received payment of such debt to the extent provided by the provisions of this title.

effectuated here. Instead, the Trustee is seeking to utilize the preference provision of the Bankruptcy Code simply to reduce SIPC's payments to customers. It will not enrich the estate of customer property. Thus, any invocation of § 547 of the Bankruptcy Code violates its purpose and violates the Trustee's duty to carry out the provisions of SIPA. Moreover, under § 547, customers have substantial affirmative defenses to a preference claim which require factual determinations. To the extent that either the ordinary course or new value defenses may be proved, it would be premature for the Trustee to deduct such amounts from SIPC payments.

**D.    Plaintiffs Have Alleged That They Suffered Damages and Their Claims are Ripe**

Where, as here, plaintiffs have suffered damages as a result of a defendant's breach of fiduciary duty, it is inappropriate to dismiss the claim for lack of ripeness. *See The Pedre Co. v. Robins*, 901 F. Supp. 660, 664 (S.D.N.Y. 1995) (breach of fiduciary duty claim is ripe where damages exist); *Parametric Capital Management, LLC v. Lacher*, 791 N.Y.S.2d 10, 11 (1st Dep't 2005) (breach of fiduciary duty claim is ripe when plaintiffs are able to allege damages arising from such breach). *Cf. Bastys v. Rothschild*, 2000 U.S. Dist. LEXIS 17944, at *119 (S.D.N.Y. Nov. 20, 2000) (dismissing breach of fiduciary duty claim as unripe because "the events alleged in plaintiff's cause of action have not yet occurred") (citations omitted).

Here, the Plaintiffs have specifically alleged that they were injured by the Trustee's eight-month delay in paying them SIPC insurance. Complaint ¶¶ 56, 105. Thus, the Bankruptcy Court's dismissal of plaintiffs' breach of fiduciary duty claim should be reversed.

**IV.    THE BANKRUPTCY COURT ERRED IN HOLDING THAT THE COMPLAINT VIOLATED THE CLAIMS PROCEDURE ORDER**

The Bankruptcy Court incorrectly held that the Claims Procedure Order "plainly applies to Plaintiffs' claim in Count I of the Complaint." Order at 10. The Claims Procedure Order only contained provisions for asserting claims against Madoff, but no procedure for asserting claims

25

against the Trustee. It states that "all claims **against the Debtor** shall be filed with the trustee," but is silent regarding claims against the Trustee. Appendix Exh G at 3; emphasis added. The Court changed the plain meaning of its own order by stating that "[p]ursuant to this order, all claims by customers must be filed with the Trustee." Appendix Exh. U at 9.

Moreover, Plaintiffs should not be penalized for following the procedure in SIPA, which expressly provides for suits against a trustee:

> Exclusive jurisdiction. Upon the filing of an application with a court for a protective decree with respect to a debtor, such court. . . shall have exclusive jurisdiction of any suit against the trustee with respect to a liquidation proceeding.

15 U.S.C. § 78eee(b)(2)(A)(ii). The Complaint complied with this statutory procedure because it was brought in the same court that was resolving the liquidation proceeding.[12] The Bankruptcy Court's holding that "the relief sought in Count I is exactly the relief available to the Plaintiffs under the Order" is incorrect, as the Claims Procedure Order provides no relief for claims alleging that the Trustee has violated his statutory duties. Order at 11. The Court's reliance on *In re Bevill, Bresler & Schulman, Inc.*, No. 85-1728 (D.N.J. May 22, 1989), is misplaced. In that case, the plaintiff merely sought a declaration that he was a "customer" of the debtor. Here, the Plaintiffs are seeking a declaration that the Trustee breached his statutory and fiduciary duties.

Moreover, the filing of the Complaint was not a way to "jump the line and obtain priority of their claims over the claims of other customers," as the Court held, nor would it invite a "chaotic race to the courthouse" by other customers or an enormous drain on the Trustee's resources. Order 11-12. The issue of net equity, once determined, would apply to all customers, as the Trustee acknowledged in a June 23, 2009 letter to Plaintiffs' counsel stating that "[s]hould a final order overrule the use of the money in/money out approach [of determining a customer's

---

[12] Indeed, defendant implicitly acknowledged the validity of a declaratory judgment claim against him by filing an Answer and Counterclaims to the Amended Class Action Complaint for Declaration Judgment in *Albanese v. Picard*, Adv. Pro. No. 09-01265 (BRL), without moving to dismiss such complaint.

"net equity"], we will be bound by that order and will apply it retroactively to all previously determined allowed customer claims." Exh. A to Appendix Exh. R. The Court also erred by finding that the Trustee's resources would be drained by litigating the Complaint. In fact, the Trustee has incurred legal fees at the rate of $1 million per week and forensic accounting fees of approximately the same amount in his effort to cheat investors out of, and save SIPC, billions of dollars. [13] A prompt judicial determination that the Trustee was violating SIPA and his fiduciary duty would have saved tens of millions of dollars in professional fees. Indeed, if the Trustee had sought a determination of "net equity" in January 2009, when he first decided to violate the statute, the issue could have been promptly decided.

The Claims Procedure Order does not apply to the claims here because it sets up a claim resolution procedure only for "customer claims which disagree with the Debtor's books and records and which are not resolved by settlement." Appendix Exh. G at 6. The plaintiffs' claims, on the other hand, are based upon the Debtor's books and records: the November 30, 2008 statements which they received from the Debtor in the ordinary course of business, as expressly required by SIPA. 15 U.S.C. § 78fff-4(c); 15 U.S.C. § 78lll(11).

Because the Claims Procedure Order does not apply, it cannot bar the Complaint. *See, e.g., United States Commodity Futures Trading Commission v. NRG Energy, Inc.*, 457 F.3d 776, 781 (8th Cir. 2006) (plaintiff did not need to seek relief from bankruptcy order and plan purportedly barring action because such order did not apply); *Theede v. U.S. Dep't of Veterans' Affairs*, 1993 U.S. App. LEXIS 16859, at *2 (9th Cir. June 21, 1993) (district court order barring plaintiff from filing any complaints without a pre-filing judicial review did not apply to action that was transferred from another district; court abused discretion by finding order applied and

---

[13] Appendix Exh. Q, awarding interim compensation in the amount of $759,228.75 to the Trustee, $14,662,319.83 to his primary counsel, Baker & Hostetler LLP and over $1,000,000 to additional counsel to the Trustee for a 15-week period.

dismissing complaint). Thus, this Court should reverse the Bankruptcy Court's holding that the Claims Procedure Order barred any of Plaintiffs' claims.

Indeed, it is the Trustee who has violated the Claims Procedure Order because that Order specifically requires the Trustee to determine customer claims based upon SIPA's definition of "net equity."

> **ORDERED, that the Trustee be, and he hereby is, authorized to satisfy such customer claims and accounts** (i) by delivering to a customer entitled thereto "customer name securities," as defined in 15 U.S.C. § 78lll(3); (ii) **by satisfying a customer's "net equity" claim, as defined in 15 U.S.C. § 78lll(11),** by distributing on a ratable basis securities of the same class or series of an issue on hand as "customer property," as defined in 15 U.S.C. § 78lll(4), and, if necessary, by distributing cash from such customer property or cash advanced by SIPC, or purchasing securities for customers as set forth in 15 U.S.C. § 78fff-2(d) within the limits set forth in 15 U.S.C. § 78fff-3(a); and/or (iii) by completing contractual commitments where required pursuant to 15 U.S.C. § 78fff-2(e) and **SIPC's Series 300 Rules, 17 C.F.R. § 300.300 et seq.**, promulgated pursuant thereto; and it is further

> **ORDERED, that with respect to claims for "net equity," as defined in 15 U.S.C. § 78lll(11), the Trustee be, and he hereby is, authorized to satisfy claims out of funds made available to the Trustee by SIPC notwithstanding the fact that there has not been any showing or determination that there are sufficient funds of the Debtor available to satisfy such claims;**

Appendix Exh. G at 5; emphasis added.

In light of the Trustee's repeated violations of the Claims Procedure Order, he should not be allowed to hide behind it. Courts have "inherent power to enforce compliance with their lawful orders through civil contempt," and the Trustee should not profit from his contemptuous behavior. *See Spallone v. United States*, 493 U.S. 265, 276 (1990).

## V. THE BANKRUPTCY COURT ERRED IN DISMISSING EBEL'S CLAIM FOR A DECLARATORY JUDGMENT THAT THE TRUSTEE HAD EXTRACTED FROM HER, UNDER DURESS, AN ACKNOWLEDGMENT THAT HER CLAIM FOR HER IRA ACCOUNT WAS LIMITED TO HER NET INVESTMENT

In a footnote, the Bankruptcy Court dismissed the portion of the Complaint that sought a declaratory judgment voiding the partial assignment and release Mrs. Ebel signed with respect to

28

her IRA account on the ground that the Trustee had extracted the release from her under duress. The Court erroneously held "[a]s this is contradicted by the plain terms of SIPA, this argument fails as a matter of law." Order at 16 n. 20. The Bankruptcy Court cited 15 U.S.C. § 78fff-2(b) in support of its holding, which states that "Any payment or delivery of property pursuant to this subsection may be conditioned upon the trustee requiring claimants to execute . . . releases[] and assignments." *Id.*

However, 15 U.S.C. § 78fff-2(b) does not require that a customer waive a portion of her claim in order to receive any SIPC advance. That would plainly contradict the purpose of SIPA, which is to "protect" investors and promote confidence in the securities markets.[14] It obviously does not promote investor confidence to allow SIPC to force customers to waive portions of their claims in order to receive any insurance. Plainly, the reference to "releases" in SIPA must refer to the use of releases to avoid double recovery (that is, requiring a customer who receives $500,000 in payment to release $500,000 of her claim against the Debtor). It makes no sense for this provision to be used to arbitrarily reduce SIPC's obligations to the customer. Indeed, if a Trustee could require customers to execute releases before they can receive SIPC funds, there would be no point to allowing an objection process.

Here, the Trustee conditioned payment of $500,000 to Ebel on her waiving her claim to the full amount in her IRA account. The Trustee had no right to require such a waiver in light of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, whose provisions preempt State fraudulent conveyance law, upon which Picard presumably

---

[14] *See, e.g.,* H.R. Rep. No. 91-1613, at 3-4 (1970)("[SIPA] will reinforce the confidence that investors have in the U.S. securities markets."). *See also In re New Times Secs. Servs. Inc.,* 371 F.3d 68, 87 (2d Cir. 2004) ("[T]he [SIPA] drafters' emphasis was on promoting investor confidence in the securities markets and protecting broker-dealer customers."); *Appleton v. First Nat'l Bank of Ohio,* 62 F.3d 791, 794 (6th Cir. 1995) ("'Congress enacted [SIPA] to . . . restore investor confidence in the capital markets[ ] and upgrade the financial responsibility requirements for registered brokers and dealers.")(citations omitted).

relies pursuant to 11 U.S.C. § 544. 29 U.S.C. § 1144(a) (the provisions of ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section [1003(a)]. . . ").

As evidence of Congressional intent to protect ERISA-qualified plans, the Bankruptcy Code was amended in 2005 to protect such plans from the claims of creditors. 11 U.S.C. § 541(b)(7)(a)(i)(I) (exempting from property of the estate "any amount withheld by an employer from the wages of employees for payment as contributions to an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 . . ."). *See also, Patterson v. Shumate,* 504 U.S. 753 (1992)(holding that debtor's interest in an ERISA-qualified pension plan may be excluded from the property of the bankruptcy estate pursuant to 11 U.S.C. § 541(c)(2)).

At a time when Ebel was not represented by counsel, the Trustee conditioned her receipt of $500,000 from SIPC on her waiver of her ERISA defenses. Ebel should never have been forced to waive her objection to the Trustee's determination regarding her IRA account in light of these clear provisions of the law. Although Ebel's objections to the Trustee's determination of "net equity" grounds has been preserved, Ebel's objection on ERISA grounds has not. Thus, the release should be voided.

Moreover, in no circumstances does the Trustee have the right to use duress. The Complaint alleges that Ebel was forced to sign an acknowledgment under duress. Complaint ¶ 58. As this Court has held, "a contract or release, the execution of which is induced by duress, is voidable." *Kiska Constr. Corp. v. G&G Steel, Inc.*, 2005 U.S. Dist. LEXIS 9821, at *16 (S.D.N.Y. May 20, 2005). In *Kiska Constr. Corp.*, the court denied defendant's motion to dismiss plaintiff's claim of economic duress pursuant to Fed. R. 12(b)(6) because the complaint

contained allegations that the plaintiff's economic circumstances led it to conclude that it had no alternative but to sign the Settlement Agreement it sought to void, and the defendant had threatened to act "in breach of his contract, and consequently unlawfully," if plaintiff did not comply with defendant's demands. *Id.* Here, Ebel's economic circumstances were such that she had no alternative to signing the release, since she was destitute and needed the funds to live. Complaint ¶ 58. Moreover, the Trustee acted unlawfully by threatening not to fulfill his obligations under SIPA unless Ebel signed the release. *Id.*

Under these circumstances, Ebel had properly alleged that the acknowledgment was procured by duress and the Bankruptcy Court erred by dismissing that portion of her declaratory judgment claim. *See Kiska Constr. Corp.*, 2005 U.S. Dist. LEXIS 9821, at *16; *see also Drees v. County of Suffolk*, 2007 U.S. Dist. LEXIS, at *30-32 (E.D.N.Y. June 27, 2007) (holding that "a plaintiff may assert a defense of duress to void the effect of a valid release" and denying motion to dismiss on ground of waiver based on stipulation where plaintiff had alleged that she was threatened that she could either lose her job or sign the stipulation, which were sufficient to make her claim that she had signed the stipulation under duress to be "plausible on its face"); *Gibli v. Kadosh*, 717 N.Y.S.2d 553, 556-557 (1st Dep't 2000) (reversing grant of motion for summary judgment dismissing complaint on ground of release where complaint contained allegations that the release had been procured under duress because "where fraud or duress in the procurement of a release is alleged, a motion to dismiss should be denied.").

## CONCLUSION

For the foregoing reasons, the Court should reverse the Bankruptcy Court's Order and order the Complaint to be restored to the calendar.

November 23, 2009

PHILLIPS NIZER LLP

By: s/s Helen Davis Chaitman

666 Fifth Avenue
New York, New York 10103-0084
(212) 841-1320
Counsel for the Plaintiffs/Appellants